# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs August 7, 2007

## STATE OF TENNESSEE v. JOHN BRITT

**Appeal from the Criminal Court for Shelby County**
**No. 03-03257     Bernie Weinman, Judge**

---

**No. W2006-01210-CCA-R3-CD  - Filed December 12, 2007**

---

The defendant, John Britt, appeals as of right his jury convictions in Shelby County Criminal Court for two counts of solicitation of first degree murder.  The trial court imposed consecutive sentences of ten years as a Range I, standard offender for each count, resulting in a total effective sentence of twenty years.  On appeal, he asserts that the trial court committed plain error in its admission of allegedly improper testimony, in failing to declare a mistrial due to improper behavior by the prosecutors during the trial, and in failing to adequately instruct the jury after the defendant was improperly impeached regarding a prior bad act.  He also asserts that the trial court improperly overruled the defendant's objection to testimony and commented on the evidence in the presence of the jury.  Finally, he urges this court to find plain error in the trial court's sentencing for multiple reasons, including allegations that the imposition of the enhanced length and consecutive manner of service violates <u>Blakely v. Washington</u>, 542 U.S. 296, 124 S. Ct. 2531 (2004).  Following our review, we affirm the defendant's convictions for solicitation of first degree murder but conclude that the trial court's imposition of sentences beyond the presumptive minimum violated <u>Blakely</u>. Therefore, upon remand, the trial court shall enter judgments to reflect sentences of eight years, for each count, to be served consecutively.

**Tenn. R. App. P.  3 Appeal as of Right;  Judgment of the Criminal Court is Affirmed in Part and Reversed in Part; Remanded**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which DAVID H. WELLES and JAMES CURWOOD WITT, JR., JJ., joined.

Karen Massey and Michael Johnson (at trial); William D. Massey and Lorna S. McClusky (on appeal), attorneys for appellant, John Britt.

Robert E. Cooper, Jr., Attorney General & Reporter; Renee W. Turner, Assistant Attorney General; William L. Gibbons, District Attorney General; Karen Cook and Emily Campbell, Assistant District Attorneys General, attorneys for appellee, State of Tennessee.

**OPINION**

The evidence presented at trial shows that the defendant solicited a former employee and acquaintance, Jan Welch, to kill his ex-wife and her mother. The defendant's ex-wife, Laurie Britt, testified that she and the defendant were married for fourteen years and had three children. She stated that they were divorced in May 2003. She further related that she filed for divorce in October 2001 when she was pregnant with their third child after learning that the defendant was having an extramarital affair. She recalled that they reconciled for a period of time in February 2002, but that she discovered the defendant "with the other woman and decided then it was time for me to just move on because he hadn't really truly sincerely changed his behavior and his patterns." She stated that although a divorce was granted in December 2002, the defendant contested the divorce and it was not actually final until May 2003. She recalled that the day the initial order was set aside on January 10, 2003, she and the children returned home from church to find their thirty-one foot recreational vehicle gone. At the time the RV was taken, the defendant was supposedly living in North Carolina with family. Ms. Britt testified that the defendant told her that he had someone take the RV. In February 2003, officers from the Bartlett Police Department came to her home to discuss the defendant with her and told her that "it concerned [her] safety." When asked about her relationship with the defendant during this time period, Ms. Britt replied:

> Well, he was definitely very very upset that I went forward with the divorce. And our conversations were very limited because he was so angry and so mad that I had moved forward and gone ahead with the divorce that we could not have a conversation without him yelling or screaming or using profanity and calling me names. So I pretty much would just say this is the end of the conversation and goodbye.

Ms. Britt also testified that there had been issues regarding the defendant's visitation with the children brought on by the defendant's destructive behavior. Specifically, she stated that on December 23, 2002, the defendant destroyed several of their vehicles by ramming them into a telephone pole, arrived at her home in a drunken rage and, when asked to leave, destroyed the mailbox upon his departure. Despite this violent behavior, February 20, 2003 was the first she learned that the defendant was trying to have her killed.

On cross-examination, Ms. Britt denied ever interfering with the defendant's visitation with the children but acknowledged that the court had order supervised visitation at his attorney's office at the time the defendant was arrested. She also admitted that she was contacted by Phil Devers, the defendant's paramour's husband, on December 26, 2002 and confirmed to him that their spouses were having an affair.

Nancy Mitchell, the defendant's ex-mother-in-law, testified that she always thought that she and the defendant had "a very good relationship" until her daughter filed for divorce. After that, she described the relationship as "[a] little contentious." She recalled that she confronted the defendant

with information about his affair in October 2001, at which time he denied the affair. She stated that her contact with the defendant after that time was limited and that she learned he had hired someone to kill her in February 2003. On cross-examination, Mitchell admitted that the defendant spent the night at her daughter's home on Christmas Eve 2002, along with the children, herself and her husband.

Bartlett Police Department Detective J.J. Leatherwood testified that he was called to the station to investigate a murder for hire allegation made by Jan Welch. After Welch arrived and made the complaint, Detective Leatherwood went to Ms. Britt's home to tell her about the allegation. During the course of the investigation, detectives equipped Welch's telephone with a recording device to record any phone calls from the defendant. After not receiving any phone calls from the defendant for several days, the detectives had Welch telephone the defendant on February 26. Based upon what transpired in his telephone conversation with the defendant, detectives arranged a meeting between Welch and the defendant for February 28. On February 28, Welch came to the Bartlett Police Department where detectives placed a body wire on him in preparation for his meeting with the defendant. Through the surveillance, detectives recorded the conversations between Welch and the defendant. The surveillance eventually culminated in the defendant arranging to meet Welch at a bank in order to pay Welch an amount of money in exchange for the murder of Ms. Britt and her mother. Detectives arrested the defendant as he exited the bank. At the station, detectives advised the defendant of his Miranda rights and questioned him. The questioning ceased when the defendant requested an attorney. Detectives videotaped the statement.

On cross-examination, Detective Leatherwood acknowledged that Phil Devers was an officer with the Bartlett Police Department but denied that Officer Devers had any involvement in the investigation of the case. He also acknowledged that Welch was instructed to meet the defendant and "recap" their previous conversations about the murders for hire.

Jan Welch testified that the defendant was his boss when he worked as a security officer for Memphis City Schools. He also indicated that the defendant had dated his sister, Kim Devers. He described his relationship with the defendant as "[m]ostly business," stating that he often did "odd jobs" for the defendant. He testified that he "repossessed" an RV for the defendant from Ms. Britt's home and drove it to Knoxville for the defendant. He recalled that the defendant and Kim Devers paid him six hundred and fifty dollars for "repossessing" the RV.

Welch stated that in February 2003, the defendant telephoned him and asked him if he "could pull another job for him." At that time, the defendant asked Welch "if [he] could find somebody to have his wife Laurie Britt done in." Initially, Welch did not take the defendant seriously, but after the defendant called back and told Welch that he could come up with the money for the down payment, Welch reported the telephone call to Officer Phil Devers at the Bartlett Police Department, his ex-brother-in-law at the time of the trial. Welch recalled that he went to Officer Devers' home and talked to a lieutenant in the department before going to the police station to discuss the incident with the detectives. Welch testified that several of his conversations with the defendant were tape recorded during the course of the investigation and that, during one conversation, the defendant

indicated that he wanted two people killed. Welch told the defendant that he knew someone that would do it, but he testified that he made that up as part of the investigation. When Welch and the defendant met to get the down payment, the defendant told Welch that he wanted Ms. Britt and her mother killed. They traveled to two banks to obtain the five thousand dollar down payment. Upon leaving the last bank, detectives arrested the defendant. Welch testified that he had never been involved in a police investigation before. He stated that he wanted to help the police catch the defendant because of the defendant's relationship with his sister and that he "felt like if [the defendant] would do this to the mother of his own children . . . who's to say he would not do it to my sister later on in life."

On cross-examination, Welch testified that he resigned from the security job because he tested positive for marijuana. He denied that the defendant fired him or that he had any ill feelings toward the defendant over the loss of the job. Welch also stated that he was not coached by the detectives regarding his conversations or meeting with the defendant. He further related that the detectives never pressured him to call the defendant.

Circuit Court Judge Donna Fields testified that she represented the defendant in contesting the divorce action filed by Ms. Britt. After the court set aside the December 2002 decree, the parties litigated the divorce for approximately six months. Judge Fields stated that Ms. Britt's actions indicated a consistent pattern of not allowing visitation. She stated that she had to intervene each time the defendant sought to exercise visitation with his children. Judge Fields testified that the defendant traveled to Memphis on February 28 to talk with her and that she told him that he would have to pay between two and three thousand dollars toward his legal fees when they met.

Bartlett Police Department Officer Doug Bailey testified that the defendant was the suspect in a criminal impersonation investigation in April 2002. He stated that Officer Phil Devers told him to check into the defendant as a suspect. He was not aware that the defendant and Officer Devers' wife were having an affair at the time. On cross-examination, he testified that Officer Devers had given him the defendant's name because his vehicle matched the description of the vehicle given by the complainant. He stated that through his investigation he discovered that the defendant did not match the physical description of the suspect, so he did not pursue the defendant any further. He denied any knowledge of a conspiracy against the defendant within the Bartlett Police Department.

Officer Phil Devers testified that he met the defendant once when he introduced himself because "[the defendant] was having an affair with [his] wife and [he] wanted him to know who her husband was." He acknowledged that he had spoken with Ms. Britt about their spouses' affair. He also acknowledged that he "despised" the defendant. He related that he and his wife attempted to reconcile, that she told him the affair was over, but that several months later he learned that they were still seeing each other. He denied ever making threats against the defendant to his wife. He recalled Welch telling him about the defendant's desire to kill his wife and stated that his only involvement in the investigation was to tell his lieutenant who contacted Welch to initiate the investigation. On cross-examination, Officer Devers related that he gave the defendant's name to Officer Bailey as a lead in the criminal impersonation investigation based upon information he

received from a Shelby County Sheriff's Department deputy. When asked to explain what he meant by despising the defendant he replied, "I loved my wife and I felt that he took her away from me." He also denied "setting up" the defendant for the solicitation of murder or criminal impersonation cases.

Kim Devers testified that she had an affair with the defendant from August 2001 until December 2001. She stated that her husband despised the defendant and would become very angry at the mention of his name. She claimed that her brother, Welch, disliked the defendant because of their affair. On cross-examination, Devers admitted that she and the defendant resumed their affair in late 2002. She denied that she stole the RV from Ms. Britt's residence, claiming that it belonged to the defendant because the court had dismissed the divorce decree and the RV was in the defendant's name. She conceded that she did not seek Ms. Britt's permission to take the RV from the residence. She also acknowledged that her husband never threatened to harm the defendant.

Phillip Ginn of First Tennessee Bank testified that the defendant had access to a home equity line of credit in February 2003, but that no withdrawals were made on the account during that time period.

The defendant testified that his telephone calls to Welch in late February related to Welch retrieving his truck from a Memphis body shop and driving the truck to North Carolina for him. He claimed that he and his ex-wife were trying to resolve the divorce in an amicable manner when she called him in tears on December 11, 2002 to tell him that she had gone ahead with the divorce. He stated that he retained Judge Fields to represent him in setting aside the decree and the subsequent litigation. He explained that he took the RV in January because he and his wife discussed him living in the RV until the property was divided. He learned that his ex-wife had reported the RV stolen while on his way to meet Welch with the RV. He stated that he called the Bartlett Police Department and explained to them that he had the RV and could not understand why it had been reported stolen. He claimed that the RV incident began the animosity between himself and his ex-wife. He related that visitation difficulties soon followed. He returned to Memphis in late February for one of his children's birthdays and to see his attorney. His attorney had advised him to bring an additional three thousand dollars for legal fees to their meeting. He recalled his conversations with Welch and characterized his statements as jokes and stated that he never intended to have his wife killed. He further stated that he never believed that Welch could hire a hit man. He explained the statement to Welch about killing his ex-mother-in-law as "just venting" because he was angry over problems regarding the birthday party. He stated that he never planned on giving Welch any money and that the money was for his divorce attorney.

On cross-examination, the defendant admitted that, except for a reference to meet at the body shop, none of the taped telephone conversations between himself and Welch contain any discussions of a plan for Welch to pick up his truck and drive it to Knoxville for him. He claimed that the plan was understood by that point due to previous unrecorded conversations. He claimed that his ex-wife would not accept his phone calls on the night he took the RV and that he did not leave her a message because "I wanted her to talk to me." The defendant also admitted that he had initiated conversations

with Welch about killing his ex-wife and her mother but insisted that he was only joking about it. He acknowledged that he continued to talk to Welch about "doing a double" because he was angry at his wife about various incidents but stressed that he was "just venting based on the circumstances." He also acknowledged discussions with Welch that he did not want his ex-wife killed at the kids' home and that she and her mother were together a lot and "[t]hat's what makes it nice." The defendant admitted that he told Welch that he only had two thousand dollars on him but that Welch could follow him to the bank. He admitted to telling Welch that there "ain't no room for error in this motherf***er." He recalled going to First Tennessee Bank but not getting any money. In summary, the defendant did not deny making any of the incriminating statements found on the tapes, but he insisted that he never intended to harm the victims.

Several witnesses testified as character witnesses on behalf of the defendant. Norman Blackley testified that he had known the defendant through a volunteer program with the Kiwanis Club and that the defendant had always been truthful in his dealings with him. On cross-examination, he stated that he was unaware the defendant smoked marijuana in the presence of his children or that he began his extramarital affair when his wife was pregnant with their third child. Samuel Moses testified that he was hired by the defendant as coordinator of security with the Memphis City Schools. He stated that the defendant had always been truthful in his dealings with him. He was surprised to learn that the defendant smoked marijuana in front of his children. He was also unaware of the defendant's affair. He stated that the fact that the affair occurred when the defendant's wife was pregnant "would cause [him] to think" about his previously stated opinion of the defendant. Louelliotte Buchanan testified that she was the defendant's executive secretary with the school system. She found him to be a truthful person but was surprised to hear about his drug use and extramarital affair.

Christopher Dorsey testified that he had known the defendant for about twelve years and considered him to be a good friend. He characterized the defendant as dependable and truthful, despite his knowledge of the defendant's drug use and extramarital affair. Similarly, Shawn Hert testified that he and the defendant had been friends for about four years. He found him to be a truthful person. He was also aware of the defendant's drug use and extramarital affair.

The state called Nancy Mitchell as a rebuttal witness who testified that she and her husband spent three nights at her daughter's home in December 2002 because her daughter "was fearful that [the defendant] was coming back to the house." She also recalled that she spent the day of January 10, 2003 taking care of the couple's baby while her daughter went to court. She stated that the defendant called sometime that afternoon looking for her daughter and never mentioned getting the RV or asking about the children.

Ms. Britt was also recalled and testified that the defendant smoked marijuana on a family camping trip on Easter 2001. She asked him to leave the campsite but he refused so she took the children to a nearby park for a few hours. She filed for divorce later that year when she learned of the affair. She stated that they reconciled in February 2002, about one month before the birth of their daughter. She said that the couple underwent counseling and that part of the counseling process was

an accountability program for the defendant regarding the affair and his alcohol and drug use. She testified that the defendant signed a promise document as part of the counseling. She also recounted several instances of violent behavior when the defendant smashed his fist into a wall and a windshield. On one occasion when Ms. Britt threw away the defendant's marijuana, she said that "[h]e elbowed me. He kneed me. And he tried to kick me out of our own bed. And he told me he hated me. He despised me. And he could not stand the thought of laying next to me."

ANALYSIS

*Plain Error*

The defendant's allegations of error on appeal deal generally with the trial court's admission of allegedly improper testimony, the trial court's failure to properly instruct the jury regarding evidentiary rulings, and the trial court's sentencing. These alleged errors occurred without objection by defendant's trial counsel. Therefore, in presenting these issues on appeal, the defendant asks this court to find plain error in the trial court's alleged failures.

Typically, a party's failure to make a contemporaneous objection to trial testimony will result in a waiver of the issue on appeal. Tenn. R. App. P. 36(a); State v. Thompson, 36 S.W.3d 102, 108 (Tenn. Crim. App. 2000). However, "an error which has affected the substantial rights of an accused may be noticed at any time, even though not raised in the motion for new trial or assigned as error on appeal," if the appellate court considers such notice "necessary to do substantial justice." Tenn. R. Crim. P. 52(b).

> In conducting a plain error review, a court will reverse for plain error only if:
> (a) The record . . . clearly establish[es] what occurred in the trial court:
> (b) a clear and unequivocal rule of law [has] been breached;
> (c) a substantial right of the accused [has] been adversely affected;
> (d) the accused did not waive the issue for tactical reasons; and
> (e) consideration of the error is "necessary to do substantial justice."

State v. Smith, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). The appellate court need not consider all five factors if it determines that any single factor indicates that relief is not warranted. Smith, 24 S. W. 3d at 283. Furthermore, for this court to reverse the judgment of the trial court, the "'plain error' must [have been] of such a great magnitude that it probably changed the outcome of the trial," and "recognition should be limited to errors that had an unfair prejudicial impact which undermined the fundamental fairness of the trial court." Adkisson, 899 S.W.2d at 642.

*Admission of Testimony*

The defendant asks that this court notice plain error in the trial court's admission of

testimony from Laurie Britt, Nancy Mitchell and Detective J. J. Leatherwood. Specifically, the defendant claims that the trial court committed plain error by permitting Ms. Britt to testify that she filed for divorce because of the defendant's infidelity, that the defendant failed to fulfill his promises during their attempt at reconciliation, that the reconciliation failed when she found the defendant with Devers, that the defendant was fired from his job, that Bartlett Police officers told her the defendant was trying to have her killed, and that the defendant damaged their property during a drunken rage. Specific to Ms. Mitchell, the defendant claims the trial court committed plain error in allowing testimony regarding detectives telling her daughter that her life was in danger and that her daughter told her that the defendant was trying to have her killed. Regarding Detective Leatherwood, the defendant claims that the trial court committed plain error by allowing testimony that the defendant requested an attorney during his interrogation.

The state argues that defendant's counsel failed to object to any of the testimony at trial, thereby precluding any opportunity for the state to lay a proper foundation. Furthermore, the state argues that the defendant elicited much of the testimony in his cross-examination of the witnesses. The state also argues that the issues are not appropriate for plain error review because the testimony did not affect any substantial right of the defendant. Following our review, we agree with the state.

This court acknowledges that much of the contested testimony could be considered evidence of prior bad acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. Tenn. R. Evid. 404(b). Rule 404(b) is generally one of exclusion, but exceptions to the rule may occur when otherwise inadmissible evidence is offered to prove the motive of the defendant, identity, intent, the absence of mistake or accident, opportunity, or common scheme or plan. State v. Tolliver, 117 S.W.3d 216, 230 (Tenn. 2003); State v. McCary, 119 S.W.3d 226, 243 (Tenn. Crim. App. 2003). Rule 404(b) states that a jury-out hearing regarding the admissibility of specific instances of conduct must be held "upon request." Tenn. R. Evid. 404(b)(1). In order to determine the admissibility of a prior bad act, the trial court should consider the following three factors: (1) whether a material issue exists supporting admission of the prior act; (2) whether proof of the prior act is clear and convincing; and (3) whether the probative value of the evidence is not outweighed by the danger of unfair prejudice. Tenn. R. Evid. 404 (b)(2)-(4). If these three thresholds are met, the evidence may be admitted.

Absent a contemporaneous objection followed by a request for a jury-out hearing, or a sua sponte hearing by the court, there is little on a record to facilitate appellate review. For this reason, this court has held that "rarely will plain error review extend to an evidentiary issue." State v. Ricky E. Scoville, No. M2006-01684-CCA-R3-CD, 2007 WL 2600540, at *2 (Tenn. Crim. App. Sept. 11, 2007). Similarly, a contemporaneous objection assists both the trial court and the appellate court in assessing the admissibility of hearsay evidence, such as that presented in the testimony of Ms. Mitchell regarding reports of threats made by the defendant to both herself and her daughter. We also note that Detective Leatherwood's reference to the defendant's invocation of an attorney during questioning was brief and relevant to law enforcement's adherence to the defendant's rights in light of the defendant's asserted defense of entrapment, which had not been withdrawn at that point of the trial.

Assuming for the sake of argument only that the contested evidence was improperly admitted by the trial court, we cannot conclude that a substantial right of the defendant has been adversely affected by its admission. The evidence in this case is sufficient to convict the defendant of two counts of solicitation of first degree murder, even without the disputed evidence. The testimony of Jan Welch and the recorded surveillance of the defendant's conversations with Welch prove the defendant's guilt. Therefore, we decline to extend plain error review to these evidentiary issues and conclude that the defendant's claims are without merit.

*Curative Instructions and Alleged Trial Court Comment on Evidence*

The defendant asks this court to find plain error due to the trial court's failure to declare a mistrial or to offer adequate curative instructions and the trial court's alleged comment on the evidence. Specifically, the defendant contends that the trial court committed plain error by failing to declare a mistrial or adequately instructing the jury to disregard the allegedly distracting behavior of the state during the presentation of the defendant's case, by not adequately instructing the jury to disregard the cross-examination of the defendant regarding bringing a firearm on school property, and by commenting on the evidence in overruling the defendant's objection to the cross-examination of the defendant. The state argues that because the defendant neither requested a mistrial nor objected to any curative instructions given by the trial court, these issues are waived.

Relative to the trial court's failure to declare a mistrial or offer an adequate curative instruction based upon the alleged distracting behavior of the state, the record reflects that at one point during the defendant's presentation of proof the following exchange occurred during a bench conference:

MS. MASSEY: Judge, I would request the State refrain from making giggling sounds and noises. This went on yesterday also, Judge, and I think it's highly inappropriate behavior.

MR. JOHNSON: I would second that motion, Your Honor.

THE COURT: You should refrain from that.

The defendant did not request a mistrial or a curative instruction but instead chose to address the perceived problem of the state's inappropriate behavior by addressing it at a bench conference. Based upon this record, we conclude that this was a decision made by defense counsel in an effort to avoid embarassing the assistant district attorneys in the presence of the jury. Furthermore, the record is unclear regarding what actually transpired in the jury's presence. As a result, we are unable to determine what, if any, effect the state's behavior may have had on the verdict. Therefore, we decline to extend plain error review to this allegation.

Relative to the defendant's claim that the trial court did not adequately instruct the jury to disregard a question on cross-examination of the defendant regarding the defendant bringing a weapon onto school grounds, the following exchange took place:

Q.     And you stayed at the school board for about a year and a half, two years?

A.     From March of 2000 until October of 2002. So two and a half years.

Q.     Two and a half years. And at that time you were fired from that job for allegedly going onto school property with a firearm, right?

A.     That's correct.

MS. MASSEY:     Judge, I'm going to object to that. That was – may we approach?

THE COURT:     Yes.

(Whereupon, a bench conference occurred.)

MS. MASSEY:     Judge, that's a criminal allegation that he's been arrested for and I think it was highly inappropriate for the prosecutor to bring that in front of the jury. That's actually – that has absolutely no relevance to anything that we're talking about here. And I'd like it stricken.

THE COURT:     What's the relevance?

MS. COOK:     It's just going to his credibility, Your Honor.

THE COURT:     Well, that doesn't go to his credibility, a charge, and you know better than that. To say something like that is going to credibility.

MS. COOK:     I apologize to the Court.
(Bench conference concluded)

THE COURT:     Ladies and gentlemen, I've sustained an objection to that and I'm going to instruct you that that has no relevance to this case. We don't know anything about any dispositions of that matter. You can disregard that completely.

This court cannot discern any error in the trial court's curative instruction upon sustaining the defendant's objection to the improper question. Therefore, we decline to extend plain error review to this allegation.

Relative to the defendant's claim that the trial court improperly commented on the evidence when it overruled a defense objection during his cross-examination. The record reflects that the state cross-examined the defendant extensively regarding the details of the defendant's procurement of the RV from his ex-wife's home on January 10. When defense counsel objected to further questioning on the basis of relevancy and argued that "[w]e've gone over this," the trial court overruled the objection, stating "[t]here's been a big issue made about the RV and I think this becomes very relevant." This court cannot conclude that the trial court's statement merits plain error review or that the statement even represents an improper comment on the evidence at all. Therefore, this issue is without merit.

*Sentencing*

In his final issue, the defendant contends that the trial court erred in sentencing him beyond the presumptive minimum sentence of eight years and in ordering the sentences to be served consecutively. The issues concerning sentencing are threefold: (1) whether the trial court imposed certain enhancement factors that were themselves essential elements of the offense of solicitation of first degree murder; (2) whether this court should notice as plain error the trial court's application of enhancement factors in violation of Blakely v. Washington, 542 U.S. 296, 124 S. Ct. 2531 (2004); and (3) whether this court should notice as plain error the imposition of consecutive sentences in violation of Blakely.

The defendant was convicted of two counts of solicitation to commit first degree murder, Class B offenses. The trial court determined the defendant to be a Range I, standard offender, subjecting him to a possible sentence ranging from eight to twelve years. The trial court imposed sentences of ten years based upon its application of the following enhancement factors:

> (2) the defendant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range;
>
> (4) the offense involved more than one victim;
>
> (11) the defendant had no hesitation about committing a crime when the risk to human life was high;
>
> (16) the defendant abused a position of private trust; and
>
> (17) the crime was committed under circumstances under which the potential for bodily injury to a victim was great.

-11-

Tenn. Code Ann. § 40-35-114(2)(4)(11)(16) and (17) (2003). The trial court also found the defendant qualified as a dangerous offender pursuant to Tennessee Code Annotated § 40-35-115(b)(4) and ordered the sentences to be served consecutively, resulting in a total effective sentence of twenty years as a Range I, standard offender.

Initially, we choose to address the defendant's allegations that <u>Blakely</u> precludes the application of enhancement factors to sentence the defendant beyond the statutory minimum sentence of eight years and the imposition of consecutive sentences. The state argues that these issues are waived because the defendant "failed to object on Sixth Amendment grounds at the time of his sentencing hearing." The state also argues that the defendant has failed to establish entitlement to plain error review by this court. Without citing any authority, the state further argues that if the trial court did err in applying an enhancement factor not found by the jury, such error is harmless because the jury would have found the factors applicable, if given the opportunity.

The record reflects that the defendant failed to object to the application of any enhancement factors on Sixth Amendment grounds at the sentencing hearing. However, the sentencing hearing in this case occurred on May 21, 2004, over a month before the Supreme Court rendered its decision in <u>Blakely</u> on June 24, 2004. Therefore, while it is arguable that the defendant could have objected based upon <u>Apprendi v. New Jersey</u>, 530 U.S. 466, 120 S. Ct. 2348 (2000) and its progeny, the defendant did not have the benefit of the <u>Blakely</u> decision at the time of sentencing in this case. Indeed, as our supreme court recently commented relative to its discussion of whether defense counsel waived for tactical reasons a Sixth Amendment challenge to a pre-<u>Blakely</u> sentence:

> it appears that defense counsel, like many others in the legal community, did not realize until <u>Blakely</u> was decided that the Defendants had a potential claim for relief under <u>Apprendi</u>.

<u>State of Tennessee v. Edwin Gomez, et al.</u>, — S.W.3d — , No. M2002-01209-SC-R11-CD, 2007 WL 2917726, at *7 (Tenn. Oct. 9, 2007) (<u>Gomez II</u>). We further note that the defendant did file a Motion to Reconsider Sentencing on September 10, 2004, which urged the court's reconsideration of sentencing in light of <u>Blakely</u>. Additionally, the defendant raised the <u>Blakely</u> issue in a Second Amended Motion for New Trial filed on April 25, 2006. The trial court denied the defendant's motion for new trial on May 8, 2006 by summary order. For these reasons, we conclude that the defendant has not waived this issue for appellate review. Therefore, we need not address the parties arguments regarding the application of plain error review to the defendant's Sixth Amendment allegations.

Relative to the defendant's allegation that <u>Blakely</u> precludes the application of enhancement factors to increase his sentence beyond the presumptive minimum in this case, our analysis has been simplified by the recent decision of our supreme court in <u>Gomez II</u> wherein the court held that:

> the [1989 Criminal Sentencing] Reform Act failed to satisfy the Sixth Amendment
> insofar as it allowed a presumptive sentence to be enhanced based on judicially

determined facts. That is, to the extent the Reform Act permitted enhancement based on judicially determined facts other than the fact of a prior conviction, it violated the Sixth Amendment as interpreted by the Supreme Court in Apprendi, Blakely, and Cunningham[ v. California, 549 U.S. ___, 127 S. Ct. 856 (2007)].

Gomez II, at *1. In Gomez II, the trial court increased the defendants' sentences based upon its findings regarding the defendants' previous histories of criminal convictions, the defendants' respective roles as a leader in the commission of an offense involving two or more criminal actors, and the defendants' possession of a firearm to commit the offense. Tenn. Code Ann. § 40-35-114(1), (2) and (9) (Supp. 2001). Our supreme court concluded that the application of factors (2) and (9) offended the Sixth Amendment and remanded the case for resentencing to determine the appropriate weight to be given the remaining enhancement factor regarding prior convictions. Gomez II, at *8.

The inescapable conclusion in this case is that the trial court likewise violated the Sixth Amendment in its application of enhancement factors to increase the defendant's sentences beyond the presumptive minimum. Notably, this conclusion extends also to the trial court's application of factor (2) regarding the defendant's criminal history because, as noted in Gomez II, the application of a factor regarding previous history of criminal *convictions* does not offend the Sixth Amendment. Id. (emphasis added). However, the defendant in this case possessed no history of convictions and the trial court based its application of this factor solely on the proof at trial regarding the defendant's criminal *behavior*, specifically the defendant's alleged marijuana use, violent behavior against Ms. Britt, carrying a weapon on school property and taking the RV from the marital residence. The defendant never admitted to any of the alleged criminal acts, other than taking the RV regarding which the record is unclear whether or not that taking was unlawful due to the circumstances of their pending divorce. While there was some discussion regarding carrying a firearm on school property during the defendant's cross-examination, the defendant only admitted that he had been fired from his job because of the allegation but did not admit that he had committed any offense. The trial court also gave great weight to the defendant's alleged criminal history in its determination of sentencing.

For these reasons, we find the state's harmless error argument unpersuasive and conclude that the trial court violated the defendant's Sixth Amendment rights in its application of the five enhancement factors. Furthermore, having concluded that the enhancement of the defendant's sentences beyond the presumptive minimum based upon judicially determined facts violated the defendant's Sixth Amendment rights, we need not address the propriety of the trial court's application of enhancement factors which may be deemed essential elements of the convicted offense. Therefore, the defendant's sentences for each count of solicitation to commit first degree murder shall be modified to the presumptive minimum of eight years.

Relative to the defendant's allegation that the trial court's imposition of consecutive sentences also violated Blakely, this court has previously held that Blakely does not preclude the imposition of consecutive sentences based upon judicially determined facts. As stated recently by this court:

The manner of service of the sentence imposed when a trial court decides whether to impose consecutive sentences-a decision it may make only after the jury has found the defendant guilty of multiple offenses beyond a reasonable doubt-does not usurp the jury's factfinding powers or offend the defendant's due process rights.

State v. Joseph Wayne Higgins, No. E2006-01552-CCA-R3-CD, 2007 WL 2792938, at *14 (Tenn. Crim. App. Sept. 27, 2007). This conclusion is consistent with previous opinions in which we concluded that the sentencing principles announced by the Supreme Court in Blakely and related cases do not impact consecutive sentencing. See, e.g., State v. William Shane Bright, No. E2006-01906-CCA-R3-CD, 2007 WL 1259177, at *2 n. 1 (Tenn. Crim .App. Apr. 30, 2007); State v. Earice Roberts, No. W2003-02668-CCA-R3-CD, 2004 WL 2715316, at *15 (Tenn. Crim. App. Nov. 23, 2004), app. denied (Tenn. Mar. 21, 2005); State v. Lawrence Warren Pierce, No. M2003-01924-CCA-R3-CD, 2004 WL 2533794, at *16 (Tenn. Crim. App. Nov. 9, 2004), app. denied (Tenn. Feb. 28, 2005). Therefore, this issue is without merit.

CONCLUSION

Finding no merit to the allegations of error regarding the trial of this case, the defendant's convictions for two counts of solicitation of first degree murder are affirmed. The trial court's enhancement of the defendant's sentences beyond the presumptive minimum based upon judicially determined facts violated the defendant's Sixth Amendment rights and the sentences shall be modified to eight years. The trial court's imposition of consecutive sentences is affirmed. Upon remand, the trial court is directed to enter modified judgments to reflect sentences of eight years for each count. The judgments are, in all other respects, affirmed.

_____
D. KELLY THOMAS, JR., JUDGE